IN RE NEFF.

[Cite as In re Neff, 20 Ohio App. 2d 213.]

216

(No. 3427—Decided November 19, 1969.)

Mr. *David D. Dowd, Jr.*, prosecuting attorney, and *Mr. Ira G. Turpin*, for appellee.

*Mr. John W. Ergazos* and *Mr. Ralph W. Ross*, for appellant, Roger Neff.

RUTHERFORD, J. During the trial of the State of Ohio against George DiGiantonio, on April 15, 1968, on a charge of breaking and entering and grand larceny, the trial judge received information from the prosecuting attorney that one George Jackson, a witness in the case, had been offered money and threatened by a person in the hallway outside the courtroom.

At that point the trial judge excused the jury and proceeded as follows, as shown by the bill of exceptions:

"The Court: Sir, will you come up here and take the stand here.

"Roger Neff, called to testify, after being first duly sworn by the court, testified as follows: [Upon examination by Mr. Mestel, assistant prosecuting attorney]"

Direct examination by Mr. Mestel

"Q. What is your name? A. Roger Neff.

"Mr. Ross: [Attorney for the defendant, George Di-

Giantonio in the case of State of Ohio v. George DiGiantonio.] Pardon me, what is this all about?

"The Court: The prosecuting attorney asked to inquire of this particular man here with respect to an incident that was reported to the court.

"Mr. Ross: Who's the incident with?

"The Court: In connection with the trial of this case. Let the record show that this takes place in the absence of the jury.

"You may proceed.

"Q. What is you name? A. Roger Neff."

Mr. Mestel, the assistant prosecuting attorney, then inquired of Mr. Neff *as to his, Mr. Neff's, conduct outside the courtroom* in the hallway, with the court also asking one or two questions, each of which questions was answered by Mr. Neff. When Mr. Mestel stated that he had no further questions but wished to call another witness, the following occurred:

"Mr. Ross: I would like the record to show that this comes as a complete surprise to me. Was that before this fellow testified or after Jackson testified? Was this before or after, Mr. Mestel?

"Mr. Mestel: Before.

"The Court: Let the record show that *the prosecuting attorney asked for an opportunity to put on evidence now with respect to the conduct of this particular witness* and the court under the circumstances feels the court ought to hear this matter immediately.
"* * *

"Mr. Mestel: I would like to excuse the witness with the understanding that he might be recalled later.
"* * *

"The Court: Roger Neff is ordered to be temporarily in the custody of the Stark County Sheriff for a few minutes that it takes to hear this matter. Does anyone know where there is a sheriff's deputy in the courthouse?"
"* * *

"Mr. Ross: If the court please, I would like the record to show that the Neff boy was put on the stand, examined

without advising him as to any rights and let the record show now they are asking the court to order this witness, ordered to testify without advice and the right to a lawyer and the defendant objects to this proceeding in this trial and for the reason moves the Court to declare a mistrial.'' (Emphasis added.)

The prosecutor and the court then proceeded to call and inquire of four other witnesses, including George Jackson, whom the prosecutor had advised the court was the informant.

At the conclusion of the testimony of the last witness, the court stated:

''The Court: Is there any officer of the court who cares to inquire of this witness, keeping the inquiry relevant to whether or not Roger Neff did in the presence of the court conduct himself in contempt of the court or so near to the court that tended to obstruct justice. Does anyone else care to inquire? All right, sir, you may stand down. Anything further, Mr. Ross?

''Mr. Ross: I have nothing further.

''The Court: Any other officers of the court have anything further?''

This was the first statement by the court to indicate to Roger Neff that he was being charged with contempt in the presence of the court or so near the court that he tended to obstruct justice. It was also the closest opportunity afforded Roger Neff to cross-examine the witnesses testifying against him; and at no time was he offered any opportunity to call witnesses to testify in his own behalf. At no time was he represented by counsel; neither was he inquired of as to whether he had anything to say relative to mitigation of sentence or anything else in his own behalf before sentence was imposed.

Following the last statement of the court quoted above, the court immediately rendered judgments and passed sentences as follows:

''Roger Neff the court finds that when you testified before this court yesterday you conducted yourself directly in contempt of court by giving false and evasive answers respecting your location in and about the hallway

outside this courtroom and it is the order of this court that you be committed to the Stark County Jail for a period of seven months, and

"The court further finds that you conducted yourself in such a way yesterday with respect to the witness George Jackson that tended to obstruct justice and you are ordered by this court to spend eleven months in the Stark County Jail for this contempt of court. I hereby order the Sheriff to take Roger Neff forthwith to the Stark County Jail. Forthwith means right now."

Roger Neff timely filed an appeal to this court on questions of law. He alleges that the Common Pleas Court committed error prejudicial to him in the following respects:

"1. In failing to advise this appellant of his right to counsel or to permit this appellant an opportunity to obtain counsel of his own choosing.

"2. In failing to advise this appellant of his right to trial by jury.

"3. In failing to advise this appellant of the charges against him or the nature of the proceedings in which this appellant was called to testify.

"4. In failing to advise this appellant of his right to remain silent.

"5. In failing to advise this appellant that any statements made by him could be used against him.

"6. In failing to advise this appellant of his right to cross examine witnesses testifying against him.

"7. The decision of the court is not sustained by sufficient evidence and is contrary to the manifest weight thereof."

In determining the law applicable to contempt proceedings, it first becomes necessary for us to classify the particular proceeding to which the law is to be applied.

First, a determination must be made as to whether the proceeding is criminal or civil in nature.

Contempt proceedings prosecuted toward the end result of preserving the power and vindicating the dignity of the court and preventing the obstruction of the administration of justice, in which an accused may be sentenced

to pay a fine or to imprisonment or both, are criminal in their nature. On the other hand, contempt proceedings instituted toward the ultimate purpose of enforcing the rights of private parties to suits and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled, in which a person, for refusal to comply with such order which he is able to perform, is committed until he complies therewith, are civil in their nature. See *Bessette* v. *W. B. Conkey Co.* (1904), 194 U. S. 324, wherein the court, at page 326, referring to criminal contempt said "it is criminal in its nature in that the party is charged with doing something forbidden, and, if found guilty, is punished." And at page 336, in such opinion, the court said "that they are criminal in their nature has been constantly confirmed."

Also, see, *Bloom* v. *Illinois,* 391 U. S. 194, decided May 20, 1968, wherein the Supreme Court of the United States held that criminal contempt is a crime in the ordinary sense as a violation of law or public wrong which is punishable by fine or imprisonment or both and that convictions for criminal contempt are indistinguishable from ordinary criminal convictions even when contemptuous conduct does not violate provisions of criminal law. At page 201 in the opinion, the court said:

"Criminally contemptuous conduct may violate other provisions of the criminal law; but even when this is not the case convictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same. Indeed, the role of criminal contempt and that of many ordinary criminal laws seem identical—protection of the institutions of our government and enforcement of their mandates."

The convictions and each of the sentences imposed in the instant case were for criminal contempt; therefore, the balance of this opinion will be confined to the law applicable to contempt proceedings such as are criminal in their nature.

From those contempt proceedings which are criminal in nature, it is also necessary to segregate those which are

held to be in direct contempt of court. If the act of the party charged with being in contempt is committed in open court in view and/or hearing of the judge or in any place set apart for use as a constituent part of the court, even though the conduct complained of was not personally seen or heard by the judge, or if the act constitutes a fraud upon the court and is such as to influence or persuade the court to make orders in its own courtroom, concerning which it probably would have done otherwise had the act not occurred, or if the act is a wrongful one calculated to impede, embarrass or obstruct the court in the administration of justice, such act constitutes a direct contempt of court. See, *In re Estate of Wright,* 165 Ohio St. 15, 25; *Hale* v. *State,* 55 Ohio St. 210, 60 Am. St. Rep. 691, 36 L. R. A. 254.

The Ohio Legislature, by Section 2705.01, Revised Code, has provided for summary punishment for acts which constitute direct contempt. Such section reads:

"A court, or judge at chambers, may summarily punish a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice."

That section is no more than enactment in a statutory form of the common-law power of courts to summarily punish for such acts of direct contempt which obstruct the administration of justice. The statute does not enlarge upon the court's power to summarily punish for contempt, nor does it limit that authority which is inherent in the court.

Statutory provision is otherwise made by Section 2705.02 *et seq.,* Revised Code, for punishment for contempts, in which cases the accused is provided by statute with the right of being charged in writing, the opportunity to be heard by himself or counsel, the right of bail, and the right of trial, in which case, if found guilty, he may be fined not more than $500 and imprisoned not more than ten days or both.

The Ohio criminal statutes also provide for punishment for bribery or intimidation of a witness. Section 2917.06, Revised Code, provides:

"No person, with intent to corrupt a witness, or to

influence him in respect to the testimony he is about or may be called upon to give in an action or proceeding pending, or about to be commenced, either before or after he is subpoenaed or sworn, shall offer, promise, or give to him or to any one for him, any valuable thing.

"Whoever violates this section shall be fined not more than five hundred dollars and imprisoned not more than sixty days."

Section 2917.07, Revised Code, provides:

"No person shall, corruptly or by threats or force, attempt to influence, intimidate, or impede a * * * witness, or officer of any court in the discharge of his duty, or corruptly or by threats or force obstruct or impede, or attempt to obstruct or impede, the due administration of justice therein.

"Whoever violates this section shall be fined not more than one thousand dollars or imprisoned in the county jail not more than six months or imprisoned in the penitentiary not less than one nor more than three years, or both such fine and imprisonment."

It is not necessary to consider the defendant's statutory or constitutional rights had the court sought to try and punish him under Sections 2705.02 *et seq.*, 2917.06 or 2917.07 of the Revised Code, since the court did not proceed under any of those sections but elected to proceed against the defendant under the court's inherent power to summarily punish for direct contempt, and, under such power, to summarily punish for direct contempt as enacted into statute by Section 2705.01, Revised Code.

However, as pointed out by the Supreme Court of Illinois in the case of *People* v. *Skar,* 30 Ill. 2d 491, 198 N. E. 2d 101, direct contempts which may be punished by summary proceedings must be divided into two classifications:

First, those in which the judge may act upon his personal knowledge of the facts, which includes those committed in open court in view and hearing of the judge, in which cases the court may punish the offender without the filing of a petition, entry to show cause, or hearing.

Second, those committed under such circumstances that the judge does not have personal knowledge of the

facts but which acts were committed in a place outside the court or in a place set apart for use as a constituent part of the court, in which cases due process requires that the charges be established by evidence.

This concept of the difference between the rights of the defendant when charged with acts which are within the court's personal knowledge and the rights of the defendant when the acts charged are not within the court's personal knowledge but must be established by taking the testimony of witnesses is not new but has its origin both within the common law and in early cases of the Supreme Court of the United States. In 4 Wendell's Blackstones Commentaries 286, Blackstone thus states the rule under the common law of England:

"If the contempt be committed in the face of the court, the offender may be instantly apprehended and imprisoned, at the discretion of the judges, without any further proof or examination. But in matters that arise at a distance, and of which the court can not have so perfect a knowledge, unless by the confession of the party or the testimony of others, if the judges upon *affidavit* see sufficient ground to suspect that a contempt has been committed, they either make a rule on the suspected party to show cause why an attachment should not issue against him, or, in very flagrant instances of contempt, the attachment issues in the first instance, as it also does if no sufficient cause be shown to discharge, and thereupon the court confirms and makes absolute, the original rule. * * *."

In *Savin, Petitioner,* 131 U. S. 267, decided May 13, 1889, by the Supreme Court of the United States, the court, after recognizing that acts of direct contempt may occur in any place set apart for the court's own use or for its officers, jurors or witnesses, stated:

"It is true that the mode of proceeding is not the same in every case of misbehavior."

Also, see, *Cooke* v. *United States,* 267 U. S. 517.

In the case of *In re Oliver,* 333 U. S. 257, decided March 8, 1948, the Supreme Court at page 275 in the opinion states:

"Except for a narrowly limited category of contempts,

due process of law as explained in the *Cooke case* requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public. If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires, according to the *Cooke case*, that the accused be accorded notice and a fair hearing as above set out.''

The foregoing cases have reference to procedural requirements of due process and fair trial when the court having jurisdiction proceeds by way of exercising its inherent power to punish for direct contempt.

The inherent power of the court to punish for contempt may not be limited by legislative authority. Power which the Legislature does not give cannot be taken away by the Legislature. If power, distinguished from jurisdiction, exists independently of legislation, it will continue to exist notwithstanding legislation. Neither is the inherent power of the court dependent upon express constitutional grant. If the proceedings are conducted under statutory authorization, it then becomes the duty of the court to follow the procedure prescribed by the statutes under which the power is being exercised, but the courts are not bound by either the statutory procedure or penalties provided in cases of direct or summary contempt, where the court acts under its inherent power, apart from statutory authority or express constitutional grant. See *State* v. *Local Union 5760*, 172 Ohio St. 75.

The courts exist, however, within the framework of the Constitution, and, while the court's inherent power to punish for direct contempt is not dependent upon either statutory authorization or express constitutional grant, no case appears to hold that the exercise of such power is entirely free of constitutional limitations of procedural due process.

The Fifth Amendment to the Constitution of the United States provides, in part:

"No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; * * *."

The Sixth Amendment to the Constitution of the United States provides, in part:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, * * * and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

Article XIV, Amendments of the Constitution of the United States, provides, in part:

"* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Section 5, Article I of the Ohio Constitution provides that:

"The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

Section 10, Article I of the Constitution of Ohio provides, in part:

"* * * the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have

a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury * * *. No person shall be compelled, in any criminal case, to be a witness against himself; * * *."

Where the circumstances have been such that the judge has personal knowledge of the acts of direct contempt already committed, the person charged with contempt by commission of the acts has waived his rights, which he might otherwise have had prior to or upon hearing and presentation of evidence. No hearing is necessary since he has already by his own voluntary acts placed the evidence directly before the court under circumstances which precluded the court from having any opportunity to advise him of any constitutional rights which might otherwise have been available to him. In such cases, he may be summarily found guilty of contempt of court, unless the punishment thereafter imposed is of such severity as to classify the contempt as a serious rather than a petty offense. See *Bloom* v. *Illinois*, 391 U. S. 194; *Cheff* v. *Schnackenberg*, 384 U. S. 373; and *Duncan* v. *Louisiana*, 391 U. S. 145.

In *Duncan* v. *Louisana, supra,* the Supreme Court of the United States held the right of jury trial in serious criminal cases to be a fundamental right and that the Fourteenth Amendment guarantees the right of jury trial in all criminal cases which, were they to be tried in federal court, would come within the Sixth Amendment's guarantee of trial by impartial jury. The court then made reference to *Cheff* v. *Schnackenberg, supra,* in which case the penalty was six months imprisonment, and the court held that crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses.

In *Bloom* v. *Illinois,* 391 U. S. 194, the United States Supreme Court likewise held the Fourteenth and Sixth Amendments to forbid both the federal and state governments from depriving a defendant of the right of jury trial of serious offenses, including serious contempt.

In *Duncan* v. *Louisiana,* the possible penalty was two

years imprisonment. In *Bloom* v. *Illinois,* the sentence imposed was two years imprisonment. And in each case the United States Supreme Court classified the offenses as serious, thus affording the defendant the constitutional right of trial by jury. In *Cheff* v. *Schnackenberg,* the sentence for contempt being six months imprisonment, the offense was classified as petty and the defendant was not afforded the right of trial by jury. That case, however, arose from a conviction in contempt in the United States Circuit Court of Appeals for the Seventh Circuit, and the guideline used in determining that a six-month sentence constituted a petty offense was Section 1, Title 18, U. S. Code, which provides:

"(3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500.00, or both, is a petty offense."

In contempt proceedings arising in state courts, there is no decision of the United States Supreme Court specifying at what point under sentence of two years the offense ceases to be classified as petty but must be classified as serious, thus affording the right of trial by jury. In *Bloom* v. *Illinois,* 391 U. S. 194, the Supreme Court of the United States had the opportunity, by way of *dicta,* to state that all convictions for contempt arising in state courts with a resulting penalty of imprisonment for more than six months would constitute a serious offense and entitle the defendant to the right of trial by jury, but did not expressly do so. The accepted rule is that any court-made rule of law must be interpreted in relation to the facts of the case which precipitated it. In *Duncan* v. *Louisiana,* 391 U. S. 145, the United States Supreme Court gave recognition to the proposition that the law of the locality may be taken "as a gauge of its social and ethical judgments" of the crime in question, citing *District of Columbia* v. *Clawans,* 300 U. S. 617 at 628.

In *Dyke* v. *Taylor Implement Mfg. Co.,* 391 U. S. 216, which case was decided on the same day as *Bloom* v. *Illinois,* 391 U. S. 194, the Supreme Court of the United States in a contempt proceeding stated:

"This court has not had occasion to state precisely

where the line falls between punishments that can be considered 'petty' and those that cannot be."

A question in the instant case is whether direct contempts of court for which respective penalties of eleven months and seven months imprisonment are imposed are offenses which Ohio may try without a jury.

Section 1.05 of the Revised Code provides:

"As used in the Revised Code, unless the context otherwise requires, 'imprisoned' means imprisoned in the county jail if the maximum term prescribed for the offense is one year or less, and imprisoned in the penitentiary if the maximum term prescribed for the offense is longer than one year."

Section 1.06 of the Revised Code provides:

"Offenses which may be punished by death or by imprisonment in the penitentiary are felonies; all other offenses are misdemeanors. As used in the Revised Code 'minor offense' is synonymous with misdemeanor."

In accordance with the provisions of those sections, the Supreme Court of Ohio, in the case of *State* v. *Pyle*, 19 Ohio St. 2d 64, decided July 9, 1969, held that:

"1. In Ohio, a misdemeanor or a minor offense is a crime for which a person may not be imprisoned in the penitentiary, and may not be imprisoned for more than one year. * * *

"2. The holding of *Miranda* v. *Arizona*, 384 U. S. 436, is not applicable to misdemeanors, as presently defined in Ohio."

There are many instances in which persons charged with misdemeanors are entitled to trial by jury under Ohio law, but as related to contempt proceedings the Supreme Court of Ohio, in *State* v. *Local Union 5760*, 172 Ohio St. 75, at page 83, stated the rule to be that trial by jury is not a necessary procedure in any criminal contempt proceeding, without any reference being made to the seriousness of the penalty. Contempt proceedings in Ohio courts cannot be controlled by Act of Congress, and there is no pronouncement by the United States Supreme Court that contempt proceedings, in state courts, resulting in sentence

of imprisonment for not more than one year cannot be considered petty or minor offenses if determined to be such by state legislative enactment and decision of the Supreme Court in the applicable state. From the holding of the Ohio Supreme Court in *State* v. *Pyle*, 19 Ohio St. 2d 64, one concludes by analogy, that in direct contempt proceedings in Ohio courts, a minor or petty offense is an offense for which a person is not imprisoned in the penitentiary and not imprisoned for more than one year, and a serious offense, which under the decision of the United States Supreme Court in *Bloom* v. *Illinois*, 391 U. S. 194, would afford the defendant a constitutional right of trial by jury under Articles VI and XIV, Amendments, Constitution of the United States, would be one resulting in imprisonment in the penitentiary or for more than one year. Under such circumstances, in view of the lack of any express decision of the Supreme Court of the United States to the contrary, and, under the rule of *stare decisis*, by following the decisions of the Ohio Supreme Court, sentences for direct contempt of court which impose imprisonment not in the penitentiary and for not more than one year constitute "petty" and "minor" offenses, thus making it possible for the state courts to proceed absent a jury trial or waiver thereof without violating any constitutional right of the defendant to a jury trial, even though the circumstances are not within the personal knowledge of the court and the charges must be established by evidence.

Turning now to those constitutional rights of the defendant, which are not divisible based upon punishment but are as applicable to misdemeanors or petty offenses as they are to felonies or serious offenses, our consideration of such constitutional rights will be confined to those applicable to direct contempt proceedings where the court may proceed summarily but which necessitate the taking of testimony as to facts which are not within the personal knowledge of the judge.

The United States Supreme Court in *In re Oliver*, 333 U. S. 257, at page 277, stated:

"* * * The *Terry case* and others like it provide no

support for sustaining petitioner's conviction of contempt of court upon testimony given in petitioner's absence. * * *''

And, in referring to the case of *Cooke* v. *United States*, 267 U. S. 517, the Supreme Court, at page 275 in *Oliver*, said:

"* * * This court said that knowledge acquired from the testimony of others * * * would not justify conviction without a trial in which there was an opportunity for defense. * * *''

At page 273, the court said:

"* * * A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel. * * *''

Also, see, page 275, in *In re Oliver*, 333 U. S. 257, which reads:

"* * * If some essential elements [of contempt of court] are not personally observed by the Judge, so that he must depend upon statements made by others for his knowledge about the essential elements, due process requires * * * that the accused be accorded notice and a fair hearing * * *.''

And see, also, page 278, which reads:

"* * * The right to be heard in open court before one is condemned is too valuable to be whittled away under the guise of 'demoralization of the courts authority.' ''

In those instances where direct contempt is charged, although such acts are not within the personal knowledge of the judge but require the taking of testimony, it is our finding that the court may proceed summarily, *i. e.*, forthwith without the necessity of formal written charges, provided the record affirmatively shows that the defendant was orally and informally given reasonable notice of the charge against him. See *Austin* v. *Denver*, 156 Colo. 180, 397 P. 2d 743, wherein the defendant upon hearing was convicted of direct contempt and fined $100. The Supreme Court of Colorado held, in the syllabus:

"3. Although there is no fixed procedural formula for contempt proceedings, * * * courts should improvise a procedure which accords with due process of law.

"4. Essential to due process in contempt proceedings is the right of one to know that the purpose of a hearing is the ascertainment of whether he is guilty of contempt.

"5. Where the purpose of the proceeding is or may be equivocal from the vantage of the person to be affected, it is the duty of the court to apprise him of the object of the hearing without delay; and it will not do to find its nature from the terms of the resulting judgment."

There appears to be no case involving either a felony or misdemeanor, which holds that the defendant has been afforded due process of law or a fair trial when the proceedings against him have been held and testimony has been taken without any notice being given the defendant of the object of the hearing. In the instant case, without any notice, the court said to the defendant, "Sir, will you come up here and take the stand?" He was then inquired of as to his conduct. After he had given answers to questions of the prosecutor, covering ten pages of the bill of exceptions, the court for the first time stated:

"Let the record show that the *prosecuting attorney asked for an opportunity to put on evidence now with respect to the conduct of this particular witness* and the court under the circumstances feels that the court ought to hear this matter immediately." (Emphasis added.)

The first time Roger Neff could know that contempt proceedings were being conducted against him was immediately before sentence, when the court, relative to the testimony of the last witness, said:

"Is there any officer of the court who cares to inquire of this witness, keeping the inquiry relevant to whether or not Roger Neff did in the presence of the court conduct himself in contempt of the court or so near the court that tended to obstruct justice?"

The defendant's constitutional right to reasonable notice of the charge against him is applicable to misdemeanors as well as felonies and to criminal contempt pro-

ceedings, both serious and petty, which require that the charges be established by evidence.

Without being given any notice of the purpose of the hearing, without counsel, and without any advice as to his constitutional rights, the defendant was also compelled by the court to be a witness against himself in the hearing which resulted in his being found in contempt. In fact, the court's compulsion extended to the point of also finding the defendant in contempt for reluctance in giving testimony against himself.

The provisions of the Fifth Amendment to the Constitution of the United States and of Section 10, Article I of the Constitution of Ohio, preclude any person from being compelled, in any criminal case, to be a witness against himself. These provisions are applicable to both felonies and misdemeanors and to criminal contempt proceedings.

In *Gideon* v. *Wainwright*, 372 U. S. 335, the Supreme Court held, at page 342:

"* * * A provision of the Bill of Rights which is 'fundamental and essential to fair trial' is made obligatory upon the States by Fourteenth Amendment. * * *"

In contempt proceedings, where the acts are not within the personal knowledge of the judge but require the taking of testimony and presentation of evidence, the provisions of Article V, VI and XIV, Amendments, United States Constitution, and of Section 10 of Article I of the Ohio Constitution, afford the defendant the right to call witnesses in his defense; and, further, due process includes the right of cross-examination of those witnesses who testify against him. There appears to be no case, either federal or state, involving either a felony or misdemeanor, holding that, in a direct contempt proceeding in which the taking of testimony is necessary, a defendant who has not been afforded the opportunity to present evidence or of cross-examination has been afforded the constitutional right of due process and fair trial. These constitutional rights to present evidence and of cross-examination are applicable to both felonies and misdemeanors and to any criminal contempt proceeding requiring the presentation

of evidence to establish the necessary elements of contempt. Also, see, *Brookhart* v. *Janis, Dir.,* 384 U. S. 1, in which case the Supreme Court held:

"* * * Petitioner's constitutional right to plead not guilty and to have a trial where he could confront and cross-examine adversary witnesses could not be waived by counsel without petitioner's consent."

Any argument that in no case has the Supreme Court of the United States made the provisions of the Bill of Rights applicable to state contempt proceedings in cases of "petty" offenses is rendered untenable by the case of *Dyke* v. *Taylor Implement Co.,* 391 U. S. 216, which arose out of a contempt proceeding in a County Court in the state of Tennessee. Upon conviction for contempt, the County Court imposed a sentence of ten days in jail and a fine of $50. The United States Supreme Court held that the conviction was for a "petty" offense and that the defendant was not entitled to a jury trial, but reversed the conviction and sentence because evidence obtained by search and seizure had been admitted without a satisfactory showing that such evidence was obtained in compliance with the Fourth and Fourteenth Amendments to the Constitution of the United States, thus holding the provisions of the Fourth Amendment prohibiting unreasonable search and seizure applicable to a state trial involving only a "petty" offense.

The defendant further contends that the court erred in failing to advise him of his right to counsel or to permit him to have an opportunity to obtain counsel of his own choosing.

As applicable to federal courts, the Supreme Court of the United States, in *Johnson* v. *Zerbst*, 304 U. S. 458, held that:

1. Under the Sixth Amendment, the federal courts have no power or authority to deprive an accused of his life or liberty, unless he has or waives the assistance of counsel.

2. Courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and,

do not presume acquiescence in the loss of fundamental rights.

3. A "waiver" is ordinarily an intentional relinquishment or abandonment of a known right or privilege.

In *Gideon* v. *Wainwright*, 372 U. S. 335, the United States Supreme Court held that the Fourteenth Amendment to the federal Constitution makes the provision of the Sixth Amendment, that in all criminal prosecutions the accused shall enjoy the right of assistance of counsel, obligatory on the states. Gideon had been sentenced to serve five years in the state prison, and the Supreme Court further held that an indigent defendant in a criminal prosecution in state court has a right to have counsel appointed for him. Gideon was charged with a felony.

In *In re Gault*, 387 U. S. 1, the Supreme Court held, at page 41:

"* * * Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child."

The question of indigency is being disregarded since that question has neither been raised nor argued on appeal. The assigned error is that defendant was not afforded an opportunity to obtain counsel of his own choosing. However, with reference to indigent defendants, see *Toledo* v. *Frazier*, 10 Ohio App. 2d 51, which holds that the state is not constitutionally obligated to furnish counsel to an indigent misdemeanant. Frazier was sentenced to six months in jail and fined $200. Also, see, Case note, 19 Western Reserve Law Review 367. Likewise, in direct contempt proceedings, for reasons previously set forth, consideration is limited to the defendant's constitutional right to counsel independent of any statutory provisions. Since sentence was not to the penitentiary and not for more than one year, consideration is also limited to cases involving misde-

meanors, *i. e.*, minor offenses, as determined by the Supreme Court of Ohio in *State* v. *Pyle*, 19 Ohio St. 2d 64. Still further, consideration is limited to cases involving loss of liberty, since there were no fines to involve taking of property in the instant case, and, also, to direct criminal contempts for which the proof requires the taking of evidence, *i. e.*, to the factual situation of the instant case.

The Supreme Court of the United States has rendered no decision expressly extending the right of counsel to state trials for misdemeanors or holding that a state is constitutionally obligated to furnish counsel to an indigent misdemeanant.

If, in state trials, a constitutional right of counsel and right of counsel by appointment of the court when the defendant is indigent are to be held applicable to misdemeanors, there is no way of knowing to which class of misdemeanors the United States Supreme Court will hold such right applicable, although *In re Gault* would indicate that it might be to those cases resulting in, or which could result in, loss of liberty. On the other hand, the court might draw the line between "petty" and "serious" offenses, as it has done with the right of trial by jury—a "petty" offense being one under federal law where imprisonment is not for more than six months. The United States Supreme Court has left the dividing line between a "serious" offense and "petty" offense, as applicable to states, without specific classification, although under Ohio law the offense would be major or serious if imprisonment in the penitentiary or for more than one year could result, and "minor" if there could not be imprisonment in the penitentiary or for more than one year.

In *Connecticut* v. *DeJoseph*, the defendant was charged in a Connecticut court with criminal nonsupport, a misdemeanor under Connecticut law punishable by imprisonment of up to one year. At his arraignment, the defendant told the judge that he was indigent and requested that counsel be appointed. The judge informed him that appointment of counsel was not possible because the charge was only a misdemeanor. At trial, the petitioner again in-

236

dicated that he wanted counsel, but his request was ignored by the judge. He was convicted and sentenced to six months in jail. The conviction was affirmed by the Circuit Court of Connecticut, 3 Conn. Cir. 624, 222 A. 2d 752. Petition for certification was denied by the Supreme Court of Connecticut, 220 A. 2d 771. The Supreme Court of the United States denied a petition for a writ of certiorari on December 5, 1966, 385 U. S. 982. In a dissenting opinon, Mr. Justice Stewart, with whom Mr. Justice Black and Mr. Justice Douglas joined, stated:

"This case illustrates, in even more compelling terms than *Winters* v. *Beck, ante,* p. 907 [385 U. S. 987,], the need for this Court to make clear the meaning of *Gideon* v. *Wainwright,* 372 U. S. 335."

Although afforded the opportunity to do so, the Supreme Court did not grant a writ of certiorari and hold the Sixth Amendment provisions to right of counsel applicable to state trials for misdemeanors.

Absent any decision of the United States Supreme Court making the right-of-counsel-provisions of the Sixth Amendment applicable to state courts in criminal proceedings for misdemeanors, what is the constitutional right of a defendant to counsel under the Ohio Constitution as applicable to convictions for direct contempt in which the taking of evidence is necessary and where the sentence imposed is imprisonment but not in the penitentiary nor for more than one year. Under the provision of Section 10, Article I, Ohio Constitution, the party accused shall be allowed to appear and defend in person and with counsel. It follows that the defendant had a right to appear with counsel of his choosing for purpose of a hearing which resulted in deprivation of his liberty by imprisonment, although not in the penitentiary and not for more than one year.

Section 2937.02, Revised Code, provides that when the accused appears before a court or magistrate upon arrest or pursuant to summons or notice, the court or magistrate shall before proceeding further:

"(A) * * *.

"(B) Inform the accused of his right to have counsel ***

"(C) ***."

Since, by the foregoing statute applicable to misdemeanors, the Legislature cannot control the court's inherent power over direct contempt proceedings, it appears that the court may condition the right of counsel under Section 10, Article I of the Constitution of Ohio, in direct contempt cases resulting in imprisonment other than in the penitentiary and for not more than one year, upon the requirement that defendant request counsel, provided that his failure to make a request may not be considered a waiver of the right except under such circumstances that failure to make the request would constitute an intentional relinquishment or abandonment of a known right or privilege. See *Johnson* v. *Zerbst,* 304 U. S. 458. The purpose of counsel being to protect an accused from his own ignorance of his legal and constitutional rights, as stated in the opinion, "the right would be nullified by a determination that an accused's ignorant failure to claim his rights removes the protection of the Constitution."

Only because of its value by way of analogy, reference is made to the case of *Mentor* v. *Giordano,* 9 Ohio St. 2d 140, decided March 15, 1967, which was not a contempt proceeding but involved a misdemeanor charged under city ordinance, which was tried in Municipal Court without a jury. Sentence was fifteen days in jail, with twelve days suspended, and a fine of $100. Section 1901.24, Revised Code, provides that:

"Any cause in a Municipal Court, either civil or criminal, shall be tried to the court unless a jury trial is demanded in writing by a party entitled to same. *** In any criminal case in which the accused desires a jury trial, a demand for a jury trial must be made by the accused or his attorney. ***"

The Supreme Court of Ohio held that:

"The guarantee of a jury trial in criminal cases contained in the state and federal Constitutions is not an absolute and unrestricted right in Ohio with respect to mis-

demeanors, and a statute, ordinance or authorized rule of court may validly condition the right to a jury trial in such a case on a written demand therefor * * *.''

At page 143 in the opinion, the court states:

''In Ohio, in cases involving misdemeanors, a statute providing that, before an accused shall be entitled to a jury trial, he must demand the same, is not violative of the constitutional right of trial by jury. *Hoffman* v. *State,* 98 Ohio St. 137, 120 N. E. 234, and *Halub* v. *State,* 127 Ohio St. 34, 186 N. E. 708. So a statute or authorized rule of court to the effect that a defendant shall not be entitled to a jury trial unless he makes demand therefor in writing within a specified time before trial is valid. 'Such statute and rule merely regulate the method of making the demand; they do not deny a party his right to a jury trial.' *Harry Goldberg Co.* v. *Emerman,* 125 Ohio St. 238, 181 N. E. 19, citing the *Hoffman case.*''

The defendant, Giordano, was represented by counsel, and there is no indication that he was ignorant of his right to demand a jury.

As previously found, Roger Neff did not have a constitutional right to trial by jury. However, in a direct contempt proceeding in which taking of evidence was necessary and which resulted in deprivation of his liberty, under Section 10, Article I of the Constitution of Ohio, he did have a right to be represented by counsel of his choosing.

Did Roger Neff waive his constitutional right (1) to reasonable notice of the object of the hearing, (2) to cross-examine witnesses appearing against him, (3) to present testimony in his behalf, (4) to not be compelled to be a witness against himself, and (5) to be represented by counsel of his choosing?

1. When Roger Neff, during the trial of State of Ohio v. George DiGiantonio, was ordered by the court, while without counsel and without any notice of the object of the proceeding, to ''come up here and take the stand here,'' followed by taking of testimony, in a hearing resulting in his conviction of contempt of court and sentence depriving

him of his liberty, he did not waive his constitutional right to reasonable notice of the object of the proceeding. Essential to due process was the defendant's right to be advised, at least informally, that the purpose of the hearing was ascertainment of whether he was guilty of contempt, and such knowledge learned from the terms of the resulting judgment comes too late.

2. Due process gives a defendant a constitutional right to cross-examine witnesses appearing against him, and the right extends to state trials whether for felony or misdemeanors, including contempt proceedings in which taking of testimony is necessary. Also, see, *Brookhart* v. *Janis, Dir.*, 348 U. S. 1, which holds that denial of defendant's right of cross-examination, without waiver, would be constitutional error, and no amount of showing of want of prejudice would cure it.

Without notice of the object of the hearing and being without counsel, the accused would have no way of knowing of his right of cross-examination of witnesses, and he did not waive such constitutional right by failure to make a request.

3. For the same reasons that defendant did not waive his right to cross-examine witnesses testifying against him, we find that he did not waive his constitutional right to present testimony in his behalf.

4. Both Fifth Amendment to the Constitution of the United States and Section 10, Article I of the Constitution of Ohio provide that no person shall be compelled, in any criminal case, to be a witness against himself.

Those provisions are applicable to state proceedings for both felonies and misdemeanors, including criminal contempt proceedings.

When a defendant is ordered by a court to take the witness stand, and further is found in contempt for reluctance or evasiveness in testifying against himself in a proceeding in which he is convicted of criminal contempt and deprived of his liberty, he has been denied his constitutional right not to be a witness against himself, which right he has not waived.

5. A defendant's right to defend in person and with counsel as provided by Section 10 of Article I of the Constitution of Ohio affords the defendant a constitutional right of counsel of his choosing in misdemeanors, including criminal contempt requiring the taking of testimony, which result in deprivation of liberty. Such right in direct contempt proceedings may be made dependent upon a request, but failure to make a request does not amount to a waiver except under such circumstances that failure to make the request would constitute an intentional relinquishment or abandonment of a known right or privilege. The defendant being without counsel, not having been advised of his right or having been given any notice of the purpose of the hearing, he cannot be held to have knowingly or understandingly waived his constitutional right to have counsel present.

We render judgment finding that Roger Neff was deprived of constitutional rights. The judgment finding Roger Neff in contempt for having acted in a way to obstruct justice and his sentence to eleven months in the Stark County jail for such contempt are vacated and the cause is remanded to the Common Pleas Court for a new hearing and for further proceedings which afford to the defendant his constitutional rights and which are according to law.

It is immaterial that further proceedings may have to be conducted by another judge of the same court, for contempt of court is directed to the court itself rather than toward an individual judge thereof.

We render separate judgment as to the Common Pleas Court's finding that when Roger Neff testified before the court he conducted himself directly in contempt of court by giving false and evasive answers respecting his location in and about the hallway outside the courtroom, and sentence that he be committed for seven months in the Stark County jail. As hereinbefore determined, Roger Neff was at the time being compelled to be a witness against himself in violation of his constitutional right under the Fifth Amendment to the Constitution of the United States and Section 10 of Article I of the Constitution of Ohio.

The court was without jurisdiction to convict a defendant of contempt on the basis of his testimony or his reluctance or evasiveness in giving testimony obtained in violation of his constitutional right not to be a witness against himself.

The judgment convicting the defendant of contempt for giving false and evasive answers while he was being deprived of his constitutional right not to be a witness against himself and sentence that he serve seven months in the county jail are reversed and vacated, and, as to this charge, final judgment is rendered ordering the defendant discharged.

> *Judgment of contempt for obstructing justice and sentence of eleven months in jail vacated and cause remanded.*
>
> *Judgment of contempt for false and evasive answers and sentence of seven months in jail vacated and final judgment rendered ordering the defendant discharged.*

VAN NOSTRAN, J., concurs in the syllabus and in each of the judgments.

McLAUGHLIN, J. (Retired. Assigned to active duty under authority of Section 6 (C), Article IV, Constitution.), concurs in part and dissents in part.

1. I concur in the reversal of the first summary contempt finding and in voiding the sentence for it.

The kind and character of this particular incident was described by Judge Putman as follows:

"Roger Neff the court finds that when you testified before this court yesterday you conducted yourself directly in contempt of court by giving false and evasive answers respecting your location in and about the hallway outside this courtroom and it is the order of this court that you be

committed to the Stark County Jail for a period of seven months, and"

This finding must be reversed, not because its proceedings lacked due process, not because it was indirect rather than direct contempt, but because Judge Putman, at the time the answers in question were given, had no judicial knowledge that they were false and evasive. The witness Jackson had not yet testified nor had the witnesses Beverly Douglas and Ralph Schreiber, the bailiff, all of whom gave testimony as to the location of the appellant in the hallway when the threat-and-bribe conversation was held.

False and evasive testimony, to be contempt, must be patent, about which there can be no difference of opinion. This particular summary contempt was based upon mere opinion. This is insufficient to support the summary finding. See *Hegelaw* v. *State*, 24 Ohio App. 103; and *Fawick Airflex Co.* v. *U. E. R. & M. Wkrs.*, 87 Ohio App. 371, 380-387.

2. I would affirm the other or second finding of summary contempt, but modify its sentence.

The other separate opinion states that "The first time Roger Neff could know that contempt proceedings were being conducted against him was immediately before sentence" and that he was denied his right to cross-examine witnesses and to present a defense.

On the contrary, reasonable notice to the defendant affirmatively appears from the record to have been given the afternoon before and the first thing the following morning before evidence was presented on behalf of the defendant.

Furthermore, there was an overnight postponement of the court's inquiry into his conduct, and the following morning the main witness, Jackson, testified and was cross-examined, after which Neff adduced, through counsel, affirmative testimony in his defense.

The hearing began at 3 p. m. on Monday, April 15, 1968, and after the testimony of Roger Neff, Beverly Douglas and Ralph Schreiber, the bailiff, the proceedings were recessed overnight. Before this recess and in the

presence of the defendant, Neff, the nature of the proceedings were expressly stated:

"The Court: All right.

"Mr. Mestel: I have nothing further, your Honor.

"Mr. Ross: I have no questions.

"The Court: All right anything further?

"Mr. Mestel: May it please the court, the witness Mr. Jackson has been sent home due to the circumstances surrounding the matter which we are now inquiring in and due to his condition as a result of that matter. For the record the court was immediately informed of this incident within a very few minutes after the incident took place and the court was informed not only by the assistant prosecutor but also by the witness himself, Mr. Jackson, and the prosecutor feels that due to the seriousness of these circumstances and due to the fact that the presence of the court has to be protected from incidents of this sort from reoccurrence, that a witness must be protected above all else and be free to give their testimony and

"The Court: Don't argue it. If you are making a motion, make it.

"Mr. Mestel: The prosecutor's office would move, or would ask the court for direction in handling this matter and in protecting the victim and the witness George Jackson from any harm.

"The Court: Of course, the problem the court has there is no evidence from George Jackson in the record. You sent him home.

"Mr. Ross: I would like to move the court to have George Jackson incarcerated then there won't be any problem.

"The Court: It is the order of the court that George Jackson forthwith be brought before this court. It was my understanding that you were going to keep him in the prosecutor's office. I didn't know you were going to send him home and have the court waiting.

"It is the order of the court that this man be immediately apprehended and brought before this court and do you have anything further on this matter?

"Mr. Mestel: I have nothing further at this time on this matter. It is quite possible that Mr. Jackson can be located very quickly."

The following morning Jackson testified and was cross-examined by attorney Ralph W. Ross.

Here the record shows a second express statement of the nature of the charge and the nature of the proceedings. This was followed immediately by presentation of evidence on Neff's behalf:

"Mr. Ross: That is all.

"The Court: Anyone else care to inquire? All right, sir, you may stand down.

"Do you have anything further to present?

"Mr. Mestel: At this time the state has nothing further.

"Mr. Ross: I would like to present something, your Honor. Will Mr. Ciracci be called to this court and testify?

"The Court: Do you understand that he is available?

"Mr. Mestel: Yes, your Honor, Mr. Ciracci is available.

"Discussion at the bench between the court and counsel off the record.

"The Court: I think it might be helpful before the witness gets here and so everyone understands what is in the court's mind. The witness Jackson has been cross-examined by Mr. Ross with respect to the matter that the court considered tending to go to the credibility of the witness and he has laid the foundation by the standard methods and I assume now he wants to offer affirmative evidence on the elicited denial from the witness.

"The main inquiry goes to whether the conduct was in the presence of or so near to the court as to obstruct the administration of justice and the credibility of the witness is in issue.

"*LOUIS CIRACCI*, called as a witness, being first duly sworn by the court, testified as follows:

"*Direct examination by Mr. Ross*"

At the conclusion of this evidence presented through counsel on Neff's behalf, the court inquired:

"The Court: Is there any officer of the court who cares

to inquire of this witness, keeping the inquiry relevant to whether or not Roger Neff did in the presence of the court conduct himself in contempt of the court or so near to the court that tended to obstruct justice. Does anyone else care to inquire? All right, sir, you may stand down. Anything further, Mr. Ross?

"Mr. Ross: I have nothing further.

"The Court: Any other officers of the court have anything further?"

There was no request for more time for any purpose.

The gist of the other separate opinion is that the defendant was not afforded due process of law.

It is my opinion that the court's inquiry is not bound by common-law or statutory rules of evidence or by technical or formal rules of procedure.

Since the summary contempt power of the court is inherent and not dependent upon express constitutional grant, due process of law is rendered so long as this defendant was afforded a reasonable opportunity for a fair hearing.

Neff, the defendant, took advantage of such an opportunity by allowing attorney Ralph Ross to cross-examine Jackson for him and by allowing him to offer the testimony of another witness, Ciracci, on his behalf.

Judge Putman described the kind and character of this finding thus:

"The court further finds that you conducted yourself in such a way yesterday with respect to the witness George Jackson that tended to obstruct justice and you are ordered by this court to spend eleven months in the Stark County jail for this contempt of court. I hereby order the sheriff to take Roger Neff forthwith to the Stark County jail. Forthwith means right now."

In my opinion, the court, having the inherent power to summarily find and punish contempt (*Hale* v. *State*, 55 Ohio St. 210, 60 Am. St. Rep. 691, 36 L. R. A. 254) and by the same token to determine its kind and character (*State, ex rel. Turner,* v. *Albin,* 118 Ohio St. 527) and consequently the power to determine, within its sound discretion, whether an act constitutes direct contempt under Section 2705.01,

Revised Code, or indirect contempt under Section 2705.02, Revised Code (*State* v. *Local Union 5760*, 172 Ohio St. 75 at page 81), did not abuse its discretion in determining that the acts of the defendant constituted direct summary contempt.

It is necessary to set forth what actually happened. Each contempt finding must stand or fall upon its own facts and circumstances.

The record speaks that:

On the afternoon of April 14, 1968, the Honorable Norman J. Putman, Common Pleas Judge, was presiding over a jury trial in the criminal case of *State* v. *DiGiantonio*. DiGiantonio was charged with breaking and entering and grand larceny. One George Jackson had been jointly indicted with DiGiantonio and had previously pled guilty. Jackson was waiting in the hallway just outside the courtroom, under subpoena to be a witness for the state and against DiGiantonio.

Immediately after Jackson testified, he reported to the prosecuting attorney's office about an incident that had happened in the hallway of the courtroom just before he took the stand. The assistant prosecuting attorney, together with the witness, Jackson, immediately reported the incident to the court. Judge Putman, in the absence of the DiGiantonio jury, conducted an inquiry in which the defendant, Roger Neff, was directed to take the stand and be sworn. He testified, in part, as follows:

"Q. Do you know George Jackson? A. I have seen him in the courtroom this morning.

"Q. Have you spoken to him today? A. No, sir.

"Mr. Mestel: Excuse me?

"Q. Have you spoken to him today? A. Yes, sir.

"Q. When? A. *During the trial here*, or during—

"Q. While the court was in session? A. The *only* thing I said to him was 'yes.' He said to me, 'It's a nice day today,' and I said, 'yes.'

"Q. *And this conversation takes place while the court is in session? A. Yes.*

"Q. You left the courtroom? A. To get a drink.

"Q. Where did you see this George Jackson? A. Standing out there.

"Q. In fact he was sitting down on the bench at the end of the hallway, isn't that true? A. Yes, I walked down that way.

"Q. The drinking fountain is right outside the door, isn't it? A. Yes.

"Q. But you walked down to where George Jackson was sitting on the bench? A. I walked down to where he was and then turned and came back.

"Q. *Did you sit down on the bench?* A. *No, sir.*

"Q. *Did you say anything to him?* A. *No, sir.*

"Q. *Did he say anything to you?* A. *No, sir.*

"Q. I thought you said he said something to you about a nice day? A. He walked up here to get a drink and I walked also and we were standing looking out the window and he said 'It's a nice day today.'

"Q. Did you see anybody else there? A. A young lady.

"Q. And she was sitting on the bench? A. Yes.

"Q. Where was she sitting in relation to where George Jackson was sitting? A. Next to him.

"Q. *You didn't sit down on that bench?* A. *No, sir.*

"Q. *Did you threaten George Jackson?* A. *Threaten him? No, I didn't.*

"Q. *Did you offer George Jackson anything if he would come in here and not testify?* A. *No, sir.*

"Q. *Did you tell Mr. Jackson that something could happen to his wife and children if he came in here to testify?* A. *No, sir.*

"Q. Did you tell Mr. Jackson that Mr. DiGiantonio would see to it that he was taken care of if he testified? A. No, sir, I didn't.

"Q. You at no time sat down on the bench beside him? A. No, I walked down the hall and came back and got a drink and he walked up too and he said, 'It's a nice day today' and I said, 'yes.'

"The Court: Wait a minute. The question was did

you at any time sit down beside George Jackson on the bench?

"A. I might have. I was not paying such attention. I walked down the hall—

"The Court: Did you or did you not sit down beside George Jackson on the bench?

"A. *If I say down it was not beside him.* I don't know I might have, *I am not sure.*" (Emphasis added.)

Another witness, Beverly Douglas, testified as follows:

"Q. And since 1:00 o'clock where have you been located in the Stark County Courthouse? A. Outside in the hallway.

"Q. Where outside in the hallway? A. Outside of the court.

"Q. You mean outside of the courtroom? A. Right.

"Q. Is that the courtroom where it is marked on the door Judge Quinn's court? A. Right.

"Q. And there is a long bench out there? A. Uh huh.

"Q. Where were you sitting in proximity to the bench? A. *I was sitting in the chair beside the bench.*

"Q. And is that chair located before you get to the bench going down the hallway? A. That's right.

"Q. *While you were sitting out there, was anyone sitting on the bench that you recall?* A. *Two boys.*

"Q. Let me ask you this. Did the two boys arrive at the bench together? A. I believe so.

"Q. Had you seen the one boy at the bench previously? A. No.

"Q. Had you seen the one boy previous to seeing the other or did you see them both together? A. I seen them both together.

"Q. *And what were they doing?* A. *They were just talking.*

"Q. *While they were sitting on the bench?* A. *Yes.*

"Q. *How long* did they sit there? A. *5 or 10 minutes maybe, not long.*

"Q. And you say that *you observed them to be talking?* A. *Yes.*

"Q. *Could you hear anything being said?* A. *No,* I heard nothing." (Emphasis added.)

Another witness, Ralph Schreiber, Judge Putman's bailiff, testified as follows:

"Q. Mr. Schreiber, do you recall having been asked to call the witness George Jackson to the stand? A. Yes, sir.

"Q. And do you recall where you located the witness George Jackson? A. *He was in the hallway, I believe, seated on the bench down at the front of the court administrator's office.*

"Q. Did you personally go out to call him? A. Yes, I did.

"Q. Was anyone seated with him on that bench? A. I don't recall. I don't remember that anyone was seated with him at that time.

"Q. This is when you went out to call him? A. Yes.

"Q. *Prior to officially calling him did you see him seated with anybody?* A. *Yes, sir.*

"Q. Do you see that individual in the courtroom who was sitting on the bench with George Jackson? A. Yes, sir.

"Q. Point him out please. A. The gentleman in the blue suit and the red hair.

"Q. Approximately when did you see—

"The Court: Let the record show that the witness pointed to the man who previously identified himself as Roger Neff." (Emphasis added.)

The record further shows that the assistant prosecuting attorney stated for the record:

"Mr. Mestel: * * * For the record the court was immediately informed of this incident within a very few minutes after the incident took place and the court was informed not only by the assistant prosecutor *but also* by the witness himself, * * *." (Emphasis added.)

The record also shows that the witness, Jackson, had been sent home and was not available to testify on that afternoon. The record indicates that the DiGiantonio jury trial was thus interrupted and did not proceed until after

Jackson had testified about the hallway incident the following morning.

When court opened on the following morning, April 15, at 9:15 a. m., Jackson was called and testified as follows:

"Q. Mr. Jackson, you testified yesterday in this court, is that correct? A. Yes.

"Q. Where were you required to wait before entering this court for the purpose of testifying? A. In the corridor, outside the door there.

"Q. Where specifically in the corridor were you? A. I was sitting along on the bench there and there is one chair beside it.

"Q. Did any unusual occurence take place while you were sitting there on the bench in the corridor? A. Yes.

"Q. Tell the court what happened. A. I was sitting out there reading a book and I don't know the name—but the gentleman sitting right there and between Mr. Chlebeck and I don't know the other gentleman with glasses— the gentleman sitting there with the blue tie and off-blue suit—

"Mr. Mestel: Red haired?

"A. Red haired.

"Mr. Mestel: Let the record show that he identified—

"The Court: He pointed out a man who was identified previously as being Roger Neff.

"Mr. Mestel: Go on.

"A. To put it in words, *he said if I testified against George DiGiantonio that a few things might happen to me; and I said 'Like what?'* and then he started not to say anything. He said, *'Well I can't talk in front of anyone.'* There was a girl sitting right by in the chair. I don't know the girl's name that was sitting outside—she is sitting in the same place again. I wanted to know what he wanted to say so I got up and walked over and we were standing where it says 'Witness Waiting Room' and I think *he began telling me if I testified something might happen to me and* I said, *'What you mean something might happen to me or my family or what?'* He said that, *well, it can be arrang-*

*ed.* And there was no one out there except for the girl at that time, so I didn't have no witness. I didn't know her as to what was going on. So I just went on and started talking to him. He said, '*How much do you want? $500.00?*' I asked him, 'What did he think I was' and then he turns around and he says, '*Well what's your price?*' and so he walked over toward the door and Antonio was looking out the door and, well, I did like this [indicating] and Antonio nodded his head and this man told me, well, he would pay and not to get up there. And I waited a few minutes and then that man [indicating].

"Mr. Mestel: The bailiff?

"A. The bailiff come to the door and he called me at that time. * * * " (Emphasis added.)

This hallway incident was reported to the court by the assistant prosecuting attorney, a court officer. It was corroborated, in pertinent part, by the court's bailiff. It was also reported to the court by the witness Jackson, who, being under subpoena, was a vital part of the court proceedings. Inherent summary contempt power includes the power to make an inquiry. This was done and this is all that was done.

The record shows, by clear and convincing evidence, contumacious acts of misbehavior by the defendant of such gravity as to interfere with the administration of justice and to warrant summary punishment.

A serious felony trial was interrupted. This caused an overnight postponement which in itself is an interference and an obstruction with the due administration of justice.

The defendant's threat-and-bribe conversation with the subpoenaed witness Jackson was intended and calculated to interfere with the due adminstration of justice. The court had the duty and responsibility, then and there, to be alert to protect the judicial process from being brought into disrepute and to act vigorously when confronted with such acts and conduct as defendant committed here.

No unjust, unfair, undue or unconstitutional advantage was taken of this defendant. He knew what the court's

inquiry was all about. Without being specifically charged in writing, he denied having the threat-and-bribe conversation, or any conversation other than a side remark about the weather, "It's a nice day," with Jackson.

Furthermore, his testimony shows that he was a close personal friend of DiGiantonio and no stranger to criminal court procedures. There was an overnight postponement of the court's inquiry into his conduct. The following morning, Jackson testified, an attorney did cross-examine him, the principal witness against Neff, and examined a witness in Neff's defense.

As to the acts of the defendant, we see from the record that Jackson was in the hallway just outside the courtroom waiting in obedience to a subpoena served upon him to be called into the courtroom as a witness, when the defendant attempted to deter him from testifying as a witness for the state, by offering him money not to testify against DiGiantonio, and by threats of bodily harm if he did so testify.

We see, also, a terrified witness, going immediately to the prosecuting attorney's office and to the trial judge for protection. If this is not direct contempt of the gravest kind and character, then such is incapable of any reasonable definition.

In the early case of *Savin, Petitioner,* 131 U. S. 267, Mr. Justice Harlan, at pages 277 and 278, used these words: "* * * If, while Flores was in the court-room, waiting to be called as a witness, the appellant had attempted to deter him from testifying on behalf of the government, or had there offered him money not to testify against Goujon, it could not be doubted that he would have been guilty of misbehavior in the presence of the court, although the judge might not have been personally cognizant at the time of what occurred. *But if such attempt and offer occurred in the hallway just outside of the court-room,* or in the witness-room, *where Flores was waiting, in obedience to the subpoena served upon him,* or pursuant to the order of the court, *to be called into the court-room as a witness, must it be said that such misbehavior was not in the presence of the court? Clearly not."* (Emphasis added.)

The case of *In re Caruba,* 139 N. J. Eq. 404, 51 A. 2d 446, at page 422 of 139 N. J. Eq., a New Jersey Court of Chancery quotes from Fox's History of Contempt of Court, page 54, *"it is a great contempt to terrify a witness that is to be examined."* (Emphasis added.)

Of vital importance in this case is the question of what is meant by "in the presence of the court." We find in the case of *Beach* v. *Beach,* 79 Ohio App. 397, at page 404, the Court of Appeals for Crawford County said:

"When they speak of 'in the presence of the court,' the courts have universally held that it is more than the idea of physical propinquity.

"Neither place nor distance from the court determines whether the act complained of is done constructively in the presence of the court. However, if the act is of such character and is done under such circumstances that naturally its effect would be felt in the actual adminstration of justice, then the act is as much done in the court's presence as if the person doing the act were actually in the court's presence. * * *"

To further ring the bell of antiquity, we harken back to *Hale* v. *State,* 55 Ohio St. 210, 60 Am. St. Rep. 691, 36 L. R. A. 254, wherein a summary finding and punishment for contempt was upheld where the accused had caused the removal of a witness from the county of his residence when such witness was under subpoena to attend the trial of a pending cause, even though such act was not done in the courtroom or in the physical presence of the court.

The issue in this case is whether the inherent power of a court summarily to inquire into and punish contempts committed in its presence or so near as to obstruct the administration of justice extends to cases of intimidating witnesses under subpoena during the hearing and waiting outside the courtroom door in a hallway immediately adjacent to the court when the court is in session.

It is claimed this power summarily to inquire and punish is limited to those acts of contempt which are done in such a way that the facts showing their existence are placed within the personal observation of the court.

It is necessary for a court to control not only the room

occupied by the judge and in view of his eyes but also the adjacent hallways wherein the law compels summoned persons to await a call to testify.

Upon notice from an officer of the court that an awaiting witness has been intimidated, the maintenance of order requires an immediate and summary inquiry. This inquiry must be immediate and summary for the reason that the court has not seen the offense but it so near as to be actually in the court's presence and as to actually threaten the continuance of the then procedure.

If the court's power over persons it cannot literally see be so limited as to permit them to hover in the spaces adjacent to the courtroom, intimidating witnesses, then the court has lost the power to carry out the business of securing that liberty under law for which it is responsible.

If the court be powerless to act without first giving complex warnings and notice and time to prepare a defense, then the offender is surely free to remain in the hall to "evil-eye" the witness. And if an officer sees him intimidate or strike a waiting witness, he will be free on bond after such acts are formally charged to flount his immunity from the court's power before the witness he seeks to intimidate.

In effect the court would then confirm and enhance the power of the intimidator to work his will in spite of the processes of the law. Thus, the necessity summarily to inquire and punish is not only equal in such cases to those where the court has seen the offense, but greater.

As to the punishment or the penalty imposed, the gravity of the offense in this case calls for a penalty of at least 6 months in the county jail. Courts have inherent power to punish for direct contempt by imposing a penalty reasonably commensurate with the gravity of the offense. See paragraph two of the syllabus of the case of *State, ex rel. Turner,* v. *Albin,* 118 Ohio St. 527.

The gravity of the offense in this case is such that this defendant should be given a reasonable penalty and not go scot free. To give him more than six months is, in my opinion, to unduly emphasize the gravity. To give him less than

six months is to unduly pamper him and his kind.

Therefore, I would modify the total penalty in this case from eleven months to six months.

In conclusion, I concur in the reversal and voiding of the seven months penalty imposed for giving false and evasive answers during the inquiry. But I would affirm the holding of direct contempt for the offense of the threat-and-bribe conversation and modify the penalty to six months.