IN RE CONTEMPT OF COURT OF WHITE ET AL., APPELLANTS
[Cite as In re White (1978), 60 Ohio App. 2d 62.]

(Nos. 4845, 4841, 4851, 5854, 4850, 4849, 4848, 4842, 4844, 4853, 4846, 4852, 4847 and 4843—Decided July 15, 1978.)

*Mr. Harry Klide, Mr. Arthur S. Leb* and *Ms. Mariella Mestel,* for the appellee city of Canton.

*Mr. Ronald G. Macala,* and *Messrs. Green, Schiavoni, Murphy & Haines,* for appellants.

PUTMAN, J. These are consolidated appeals of fourteen public school teachers sentenced for criminal contempt arising out of their January 5, 1978, violation of a temporary injunction prohibiting blocking school entrances and picketing on school property on school days during school hours (8 a.m. to 4 p.m. Monday through Friday).

The cases were tried together.

The temporary injunction was issued only after an evidentiary hearing on January 3, 1978, involving the same

parties and counsel who attended the later contempt hearing. No attempt was made to set aside that January 3rd order. Instead immediate and massive disobedience of that order followed, attended by mass media coverage. It continued during service of the order on pickets at school sites. Sheriff's deputies reported to the court, in substance, that picketing leaders stated when served that they didn't care what the court said, they did not intend to obey. Consequently, in the afternoon of January 4, 1978, the court, having personally seen the school hour picketing of school entrances on both days, sent the sheriff out with separate written orders to serve all pickets with cease and desist orders and to bring all violators before the court. A total of 145 were brought before the court on January 5, 1978.

This appeal concerns fourteen who were brought in by Deputy Sheriff Roshong from Timken Senior High School after service at 8:25 a.m. on January 5, 1978. The hearing began at 9:38 a.m. the same day.

The court made a painstaking and detailed explanation of the nature of the procedure, recessed from 10 a.m. to 10:20 a.m., after denying a request for one hour, and thereupon conducted an evidentiary hearing.

Deputy Sheriff Roshong testified that he served copies until the supply was exhausted, announced three times in a loud voice the court's order to cease, desist, and disperse and upon refusal further announced that he was obliged to arrest all who would not obey and directed all to either obey and leave or line up at a specific spot to be arrested; whereupon, all promptly lined up to be arrested rather than leave as ordered. He stated that they were taken directly to the courtroom stopping only to give names and other information.

Counsel for the appellants were invited by the court to cross-examine the deputy and cross-examination was waived.

Thereafter, the court directed the individual names to be called (obviously from the list taken by the sheriff from those arrested). After the first two cases were heard, a recess from 10:50 a.m. to 11:06 a.m. was granted. After the tenth case was heard, a recess from 12:04 p.m. to 1:15 p.m. ensued.

During all of this time, following the waiver of cross-examination of the deputy, the court engaged in a patient and painstaking effort to persuade each individual to present

some defense, and failing that, to purge himself. The court offered, in effect, to forgive all in exchange for a simple promise not to picket schools during school hours in the future. His efforts were met with evasions of such uniformity as to infer prior planning and agreement, with two exceptions. One declared he was "going with the rest," and the other stated that he would immediately picket again if released.

Sentence was pronounced on each in turn.

The roll call was interrupted by counsel for the school board asking to talk to the judge at 1:45 p.m. At 3:25 p.m. court reconvened.

Counsel for the appellants moved for a continuance "assuring the court" there would be no more violations "this evening"; whereupon, all were released on their own recognizances and this release, incorporated into the later journalization of sentence, apparently continues today. The strike has since been settled with no claim of further violations and no interest having been exhibited by anyone in proceeding further against anyone for these particular violations.

The sentence entry finds each appellant:

"***[I]n contempt of court in two particulars as follows: first, for violating the order of the court, and, secondly, in direct contempt of this court for refusing to state whether he/she would obey the order of the court in the future." Each was sentenced to pay a $500 fine and spend ten days in jail.

From the sentences each appellant, by a common brief, assigned eight errors.

## I. and V.

"*Assignment of Error No. 1:* The temporary restraining order issued by the court below was improvidently granted and a claim violation of that order cannot support a finding of contempt on the part of appellants."

"*Assignment of Error No. 5:* The trial court's restraining order, prohibiting picketing and other concerted activity, is impermissible, constitutionally infirm, and without basis in law; and, an alleged violation of that portion of the restraining order cannot form the basis for a finding of contempt, whether direct or indirect."

The heart of this controversy is the erroneous proposition

implied in both the above assignments. It negates the concept of a government of laws and not of men which is the foundation of our constitutional liberty. The law on this point has been settled as long as our republic has existed.

It was restated in 1947 by the United States Supreme Court in *United States* v. *United Mine Workers of America* (1947), 330 U. S. 258.

There, the court affirmed a fine for contempt of court against John L. Lewis, the president of the United Mine Workers Union, in the amount of $10,000, and against the union, in the amount of $750,000, for disobeying a temporary restraining order issued by a trial court prohibiting a strike and ordering all parties to maintain the status quo while the court decided whether or not to permanently enjoin the strike. It was claimed the trial court had no authority to issue the permanent injunction and hence the temporary order was void.

The headnotes found in 91L. Ed. 885 state, in part, as follows:

"12. The fact that a court's jurisdiction to grant ancillary injunctive relief sought is open to question does not affect its power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction.***

"13. Disobedience of a temporary restraining order made for the purpose of preserving existing conditions pending determination of the question of the court's jurisdiction, is punishable as criminal contempt where the question of jurisdiction is not frivolous but substantial.***

"14. An order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings, even though the statute under which the order is issued is unconstitutional.***

"15. Violations of a court order are punishable as criminal contempt even though the order is set aside on appeal as in excess of the court's jurisdiction or though the basic action has become moot.***

"20. Conduct can amount to both civil and criminal contempt, and the same acts may justify a court in resorting to

coercive and to punitive measures, which may be imposed in a single proceeding.***

"25. Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court.***

"26. In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the wilful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge."

In his separate concurring opinion, Justice Felix Frankfurter, a Roosevelt appointee and an avowed friend of labor said, at pages 307 - 312, the following:

"The historic phrase 'a government of laws and not of men' epitomizes the distinguishing character of our political society. When John Adams put that phrase into the Massachusetts Declaration of Rights he was not indulging in a rhetorical flourish. He was expressing the aim of those who, with him, framed the Declaration of Independence and founded the Republic. 'A government of laws and not of men' was the rejection in positive terms of rule by fiat, whether by the fiat of governmental or private power. Every act of government may be challenged by an appeal to law, as finally pronounced by this Court. Even this Court has the last say only for a time. Being composed of fallible men, it may err. But revision of its errors must be by orderly process of law. The Court may be asked to reconsider its decisions, and this has been done successfully again and again throughout our history. Or, what this Court has deemed its duty to decide may be changed by legislation, as it often has been, and, on occasion, by constitutional amendment.

"But from their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised. 'Civilization involves subjection of force to reason, and the agency of this subjection is law.' The conception of a government by laws dominated the thoughts

of those who founded this Nation and designed its Constitution, although they knew as well as the belittlers of the conception that laws have to be made, interpreted and enforced by men. To that end, they set apart a body of men, who were to be the depositories of law, who by their disciplined training and character and by withdrawal from the usual temptations of private interest may reasonably be expected to be 'as free, impartial, and independent as the lot of humanity will admit.' So strongly were the framers of the Constitution bent on securing a reign of law that they endowed the judicial office with extraordinary safe-guards and prestige. No one, no matter how exalted his public office or how righteous his private motive, can be judge in his own case. That is what courts are for. And no type of controversy is more peculiarly fit for judicial determination than a controversy that calls into question the power of a court to decide. Controversies over 'jurisdiction' are apt to raise difficult technical problems. They usually involve judicial presuppositions, textual doubts, confused legislative history, and like factors hardly fit for final determination by the self-interest of a party.***

"Only when a court is so obviously traveling outside its orbit as to be merely usurping judicial forms and facilities, may an order issued by a court be disobeyed and treated as though it were a letter to a newspaper. Short of an indisputable want of authority on the part of a court, the very existence of a court presupposes its power to entertain a controversy, if only to decide, after deliberation, that it has no power over the particular controversy. Whether a defendant may be brought to the bar of justice is not for the defendant himself to decide.***

"A majority of my brethren find that neither the Norris-LaGuardia Act nor the War Labor Disputes Act limited the power of the district court to issue the orders under review. I have come to the contrary view. But to suggest that the right to determine so complicated and novel an issue could not be brought within the cognizance of the district court, and eventually of this Court, is to deny the place of the judiciary in our scheme of government. And if the district court had power to decide whether this case was properly before it, it could make appropriate orders so as to afford the necessary time for fair consideration and decision while existing conditions were

preserved. To say that the authority of the court may be flouted during the time necessary to decide is to reject the requirements of the judicial process.

"It does not mitigate such defiance of law to urge that hard-won liberties of collective action by workers were at stake. The most prized liberties themselves presuppose an independent judiciary through which these liberties may be, as they often have been, vindicated. When in a real controversy, such as is now here, an appeal is made to law, the issue must be left to the judgment of the courts and not the personal judgment of one of the parties. This principle is a postulate of our democracy.***

"In our country law is not a body of technicalities in keeping of specialists or in the service of any special interest. There can be no free society without law administered through an independent judiciary. If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny. Legal process is an essential part of the democratic process. For legal process is subject to democratic control by defined, orderly ways which themselves are part of law. In a democracy, power implies responsibility. The greater the power that defies law the less tolerant can this Court be of defiance."

Were this claim not raised on behalf of the teachers of the young minds of our community, we would have rejected it as frivolous and write no further.

The words here quoted from Frankfurter belong in the lessons taught *by* teachers *about* the courts—not taught *to* teachers *by* the courts.

Accordingly, we state again what has been settled and clear since the founding of the republic. The temporary injunction was valid. Public employee strikes are illegal and may be enjoined. Our Ohio Supreme Court said so as recently as 1971, in *Goldberg* v. *Cincinnati* (1971), 26 Ohio St. 2d 228.

But legal or illegal, the United States Supreme Court in the United Mine Workers case cited above said:

"The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril. In imposing a fine for criminal

contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge."

Contrary to the specific assertion of the fifth assignment of error, the portion of the court's order here enforced was not a prohibition against all picketing as in Clark County Court of Appeals Case No. 1187, decided June 9, 1978, but an order against picketing school property 8 a.m. to 4 p.m. Monday through Friday.

## II.

*"Assignment of Error No. 2.* The trial court erred in characterizing appellant's alleged conduct as direct contempt of court and in proceeding under Section 2705.01 of the Ohio Revised Code, the direct contempt statute."

This claim is rejected upon the authority of the *United Mine Workers* case, *supra* and *Hale* v. *State* (1896), 55 Ohio St. 210, 214, 215. In the *Hale* case the court said:

"A people does not lose majesty by achieving liberty. The powers of government are the same, whatever may be the form. Here, the people possessing all governmental power, adopted constitutions completely distributing it to appropriate departments. They created courts, and, in some instances, authorized the legislatures to create others. The courts so created and authorized have all the powers which are necessary to their efficient action, or embraced within their commonly received definition. The power in question was lodged permanently in the courts to be exercised by those who, for the time being, may be charged with the performance of judicial duties. But judges may not remain in office and resign their functions. * * *

"The conclusion is a necessary inference from the very numerous cases in which it has been held that the power inheres in courts independently of legislative authority. A power which the legislature does not give, it cannot take away. If power, distinguished from jurisdiction, exists in-

dependently of legislation, it will continue to exist notwithstanding legislation."

*In re Neff* (1969), 20 Ohio App. 2d 213, restates the law and cites the precedents. The trial court obviously intended to comply with all aspects of that restatement. We need not reprint that text in full.

Disobedience to the sheriff, the arm of the court, as shown by this record is direct criminal contempt.

See *State* v. *Union* (1961), 172 Ohio St. 75, Paragraph two of the syllabus:

"A court is constructively present wherever any of its court officers are engaged in the execution of the business of the court according to the law."

The court also stated, at pages 80-81:

"If a court has inherent power to punish for contempt summarily, it must by the same token have the power to determine the kind and character of conduct which constitutes such contempt. *State, ex rel. Turner, Atty. Genl.,* v. *Albin,* 118 Ohio St., 527, 161 N. E., 792. Consequently, the fact that Section 2705.02, Revised Code, inferentially classifies an act of resistance to a lawful court process or order as an act of indirect contempt does not limit the power of a court to determine, in its sound discretion, whether such an act constitutes direct or indirect contempt. Power which the Legislature does not give, it cannot take away. If power, distinguished from jurisdiction, exists independently of legislation, it will continue to exist, notwithstanding legislation." *Hale* v. *State, supra; State, ex rel. Turner,* v. *Albin, supra.*

### III.

"*Assignment of Error No. 3:* The trial court erred in denying appellants' motion for a continuance of the contempt proceedings and in refusing to grant appellants a reasonable amount of time to prepare for those proceedings."

Upon a careful reading of the record we find the continuances actually granted by the trial court were sufficient under the totality of the circumstances to permit a fair hearing of the charges under essential due process.

The accused were parties to the cause and were school teachers. Their Columbus lawyer was on hand at the start of

the 9:38 a.m. proceedings indicating that he was expecting the arrests an hour earlier: no claim of mistake or mistaken identity was made by counsel; no request for time to get witnesses was made, and no claim of misunderstanding was made. This was the situation in spite of the persistent but futile efforts of the trial judge to persuade those accused to present a defense.

How long does a teacher need to decide whether or not he has obeyed or will obey a court order?

## IV.

"*Assignment of Error No. 4:* The trial court erred in compelling defendants to testify against themselves."

The inquiry of the trial court was manifestly not for the purpose of eliciting evidence from the accused. The journal entry makes this clear. It states:

"Whereupon the court conducted a show cause hearing and heard the evidence, statements of counsel, and statements of the accused. In connection therewith the court explained its previous order and inquired of the accused whether he/she would in the future comply with that order and the accused refused to state whether he/she would comply with the court's order in the future."

Thereupon the finding was:

"***[I]n contempt of court in two particulars as follows: first, for violating the order of the court, and, secondly, in direct contempt of this court for refusing to state whether he/she would obey the order of the court in the future."

The court having stated by his entry that he made no evidentiary use of any "statements of the accused" we find the fourth assigned error to be without merit and it is overruled.

This conclusion is fortified by the fact that the court did not swear or place the accused under oath in any case. Compare *In re Neff* (1969), 20 Ohio App. 2d 213, where the court called the accused as a witness and administered an oath. (Page 216.)

"*Assignment of Error No. 6:* There is no evidence that appellants had knowledge of the court's restraining order or that they actually engaged in picketing in violation of that order."

This assignment of error is overruled. The testimony of the deputy is sufficient in the absence of the cross-examination to establish that the people before the court were in fact the ones he found violating the "no picketing school property during the school hours" order. They defied his order to leave and were brought with him to the court. They are the ones who gave the names and addresses which were subsequently called by the bailiff. Upon that call each came forward.

The evidence in this case reasonably supports the conclusion that those arrested had not only intentionally disobeyed the "arm of the court" when given a direct order but did so with a "show the world" attitude. The fact that they did all of this in an otherwise polite and orderly manner goes to the issue of penalty, not guilt.

We conclude from the entire record, including the presence of attorneys Gee and Macala on behalf of these named parties at the January 3, 1978; the evidentiary hearing on whether the order in question should issue at all; their protests then that it should not issue absent evidence of violence; the court's declaration of personal knowledge of mass disobedience to that order continuously from its announcement; the reported defiance of the court and sheriff by those served with orders to desist on January 4, 1978; and the presence of Mr. Gee, a Columbus lawyer, in the courtroom at 9:38 a.m. of January 5, 1978, for a hearing resulting from arrests commencing at 8:20 a.m. that same day; that the trial court reasonably could have concluded that each one of the appellants was engaged in carrying out a prior agreement to engage in concerted action calculated to demonstrate that they could effectively disobey the court's order whenever it suited the policy options selected by them.

## VII.

"*Assignment of Error No. 7:* The trial court erred in finding appellants guilty of contempt for failing to decisively indicate whether they would prospectively comply with the court's restraining order."

This assignment of error is sustained as to all appellants.

The second specification of contempt does not, by its terms, cover the affirmative responses of appellants Charles

Riffle, Charles Straus, and Delbert Horton. Those three did not elect to stand by their Fifth Amendment claim and refuse in fact to declare as to the future but gave a contumacious response to the court's invitation to purge themselves of the contempt involved in picketing.

Charles Riffle told the court if released he would go right back out and picket again in violation of the order.

Charles Straus responded: "Sometimes I'm a slow thinker, and sometimes I'm a fast thinker."

Delbert Horton said it depended on what the Board of Education did and they are slower than Straus.

The court could reasonably have concluded that this was intentionally disrespectful conduct calculated to demonstrate to his peers he could do it with impunity. But he did not so find in his judgment entry.

We carefully consider the claims of privilege against self incrimination under the Fifth Amendment with respect to the assignment of error and find it to be not available. None of the accused was sworn. It was obvious in the context of the court's inquiry that no evidence was sought.

The hard facts of the matter were that the court had before him parties to a pending civil lawsuit, all fellow public servants as a matter of fact, and he was faced with their massive disobedience to his order. He was further faced with the fact of an intentional display of this disobedience to adults and students alike throughout northeastern Ohio by the vehicle of mass media coverage. He was attempting, somewhat in the manner of a coach in a locker room at half-time, to persuade them to figuratively go on out there and show the student body that we Americans obey court orders until they are set aside by due process of law.

He failed.

We consider that the responses of Riffle, Straus, and Horton could reasonably have been found by him to be intentionally disrespectful to the authority of the court in the face of the court.

The request for more time could reasonably be viewed as an evasion. How much time does a teacher need to decide whether he will abide the order of a court?

Considerations of motivation such as the belief in whatever other principle the accused chose to give priority,

and the belief that justification existed because the Board of Education had not complied with other parts of the order and the belief that the order was unlawful all go to the question of penalty, not guilt.

Given the facts of this case and the painstaking explanation and solicitation of the court, we find their response goes substantially beyond a mere refusal to present a defense or a mere election on their part to refuse the court's offer to purge themselves.

However, the trial court did not elect to make that specific finding as to contempt in that particular as to those three appellants, and this court cannot affirm a finding not made by the trial court. We have no authority to consider the record anew as though we were the trial court. We have this case on law questions only.

It is manifest upon the face of this record that the trial court recognized the need for an evidentiary hearing which met minimum due process requirements under the circumstances. (*In re Neff, supra.*) He practically pleaded with the appellants represented by counsel to indicate a desire to present some defense. They refused. They elected not to cross-examine the deputy, not to call witnesses, to present no defense, and not to purge themselves. This was their legal right. The mere refusal to defend against an accusation of criminal contempt is not *per se* a separate act of contempt.

In the same manner the trial court, figuratively speaking, begged the appellants to accept his invitation to purge themselves of the contempt by simply promising not to picket schools during school hours in the future. They declined. They had a legal right to decline to purge themselves. The mere election not to purge oneself of a contempt is not *per se* an independent act of contempt.

As to all appellants, the specification based upon the refusal to promise future compliance is reversed. Bruce Samoila and George Day were never asked by the court to promise to obey in the future. Accordingly, the record contains no response from them. We find the specification as to the refusal to promise future compliance to be not supported by the record based upon the authority of *Slagle* v. *Ohio* (1961), 366 U. S. 259. That case arose from Stark County and was decided by the United State Supreme Court. Although

that case involved witnesses where this case at bar does not, the fair play principles are identical in our opinion. There certain witnesses were charged with contempt for refusing to answer questions. There, as here, each claimed the Fifth Amendment privilege against self incrimination as to each question. There as here, the tribunal indicated at the beginning that the claim was not available at all.

Headnotes found at 6 L. Ed. 2d 278, state, in part, as follows:

"3. Traditional notions of fair play contemplate that a person summoned to testify before any adjudicatory or investigatory body, including a legislative investigatory body, may object to any question put to him upon any available ground, however tenuous.***

"4. In an examination of a witness summoned to testify before any adjudicatory or investigatory body, no particular form of words is necessary to sustain or overrule an objection by the witness that an answer would compel him to be a witness against himself, or violate other constitutional rights; all that is necessary is that the hearing tribunal make plain its disposition of the objection and whether an answer is excused or required.***

"5. An adjudicatory or investigatory body sustains or acquiesces in a witness' objection to one of its questions if (1) it directs the examiner to pass on to the next question, or (2) the examiner or some member of the hearing tribunal does in fact immediately pass on to the next question.***

"6. A witness before an investigating committee of a state legislature is deprived of due process of law, in violation of the Fourteenth Amendment, if he is held in contempt for refusal to answer questions after the committee has sustained or acquiesced in his objections thereto by failing to direct him to answer the questions.***

"7. A clear disposition of a witness' objection to a question propounded to him is a prerequisite to a prosecution of the witness for contempt in refusing to answer the question."

"The Court, at 366 U. S. 267, stated:

"That a clear disposition of the witness' objection is a prerequisite to prosecution for contempt is supported by long-standing tradition here and in other English-speaking nations. In this country the tradition has been uniformly

recognized in the procedure of both state and federal courts.' *Quinn* v. *United States,* 349 U. S. 155, 167 and cases cited. See also *Emspak* v. *United States,* 349 U. S. 190, 202; *Bart* v. *United States,* U. S. 219, 223. 'Because of the (Commission's) consistent failure to advise (appellants) of (its) position as to (their) objections, (appellants were) left to speculate about the risk of possible prosecution for contempt; (they were) not given a clear choice between standing on (their) objection(s) and compliance with a committee ruling.' *Bart* v. *United States, supra,* at 223.

"In these circumstances, to hold that these witnesses willfully and contumaciously refused to answer the questions to which they objected but which they were not directed to answer would deprive them of due process in violation of the Fourteenth Amendment."

We analyze the record on the assumption that the "I don't know" response was considered by the trial court as an evasion and a refusal to respond. Perhaps the trial court in the case at bar overlooked the continuing objection noted in the record as to each inquiry he made for he did not direct the accused to respond under penalty of contempt. We hold the rule of *Slagle* v. *Ohio, supra,* required of him, as to each separate inquiry to each separate question, a separate clear overruling of the Fifth Amendment objection followed by a clear direction to answer so that the accused faced a clear choice between either responding or standing by the objection and risking a possible additional contempt punishment.

## VIII.

*"Assignment of Error No. 8:* The sentence imposed upon the appellants is inconsistent and excessive and must be vacated and reversed."

This assignment of error is patently without merit and is overruled. The sentence is not excessive as a matter of law. The record as to the deliberate violation of the injunction not to picket schools during school hours easily supports the sentence. Children are intimidated from crossing the picket lines and the picketers in effect take the school system hostage. Frequently a teacher is the most powerful single influence in the life of an individual. The future of our "government of laws" rests with those they teach. Their actions

speak louder than their words. In this connection we restate with emphasis the words of United State Supreme Court Justice Frankfurter in the *United Mine Workers, supra,* at 312:

"The greater the power that defies the law the less tolerant can this Court be of defiance."

For the foregoing reasons the finding and judgment of the Court of Common Pleas of Stark County insofar as it finds each appellant in contempt of the court's order in the first particular is affirmed, and the finding of contempt as to each appellant for refusal to state as to future compliance is reversed.

We are unable to determine from the record what sentence the trial court (who heard the evidence) would have elected to impose for the first specification independent of any consideration of the second. Accordingly, we vacate the sentence as to each appellant and remand each cause to the Court of Common Pleas of Stark County, for further proceedings according to law on the finding and judgment based on the first specification of contempt.

*Judgment affirmed*
*in part and reversed*
*in part and causes*
*remanded.*

RUTHERFORD, P. J., and DOWD, J., concur.